The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some modification. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Plaintiff moved to dismiss defendants appeal to the Full Commission for failure to timely file the appeal pursuant to N.C. Gen. Stat. 97-85. Defendant responded that the Opinion and Award of Deputy Commissioner Hedrick was received by his law firm on February 23, 1999, and Notice of Appeal was received by the Commission on March 10, 1999. Therefore, the Notice of Appeal was timely filed and plaintiffs motion to dismiss is DENIED.
***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On the date of plaintiffs alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. A video-tape marked as Stipulated Exhibit Number Two was admitted into evidence.
***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was forty-one years old. He is a high school graduate. He had been employed by defendant for approximately eleven years. During the first eight years of his employment, plaintiff was an assistant brake press operator. During the last three years, he was employed as a head brake press operator.
2. Defendant used the brake press to bend or crease sheets of metal into pre-determined shapes. The size and weight of the sheets varied depending upon the specifications for particular orders. Some sheets weighed as much as forty pounds and measured ten inches by twelve feet. Other sheets were as wide as forty-four inches. When processing smaller or thinner gauge metal sheets, two sheets were processed simultaneously by stacking the sheets on top of one another.
3. The sheets were bent or creased in accordance with computerized instructions. The instruction data was entered into the machines computer by the head press operator. The type and number of bends varied from order to order. One metal sheet might be bent as many as four times. The head press operator and his assistant were required to insert a sheet into the machine for each bend. Some sheets had to be manually turned or flipped before insertion into the machine for bending. Some sheets had to be turned or flipped more than once before all bends were made.
4. Metal sheets came to the press in stacks that were placed on top of rolling carts. The head press operator and his assistant lifted the sheet from the stack, turned them as necessary, placed them into the machine, turning and re-inserting as necessary and then removed the sheets from the machine and placed them back onto the carts. The operators then repeated this process.
5. The head press operator was responsible for entering data into the press computer. The data was entered by pressing buttons on a keypad. The keypad was located at plaintiffs shoulder height. Plaintiff, who was right-hand dominant, used his right hand to enter data on the keypad. Plaintiff used three fingers to push the buttons on the keyboard to enter the data. The number of times the machine required programming varied from day-to-day. Some days, new data was entered into the machine throughout the work shift. Other days, very little new data was entered into the machine. On average, plaintiff spent twenty-five to thirty percent of his shift entering data into the machine.
6. Plaintiff worked five days per week, eight hours per day. Plaintiff performed the duties of a head press operator as previously described.
7. In January 1997, plaintiff presented to Dr. Gilmer for treatment of a ganglion cyst on the dorsal aspect of his right wrist. At that time, the cyst had been present for approximately one year but had recently become painful. Plaintiff also had right wrist tendonitis. Dr. Gilmer treated these conditions surgically.
8. While continuing to receive follow up treatment from Dr. Gilmer in March 1997, plaintiff began exhibiting symptoms consistent with carpal tunnel syndrome. Plaintiff had bilateral carpal tunnel syndrome. His bilateral carpal tunnel syndrome was not caused by his ganglion cyst, tendonitis or the surgery performed to treat those conditions.
9. Carpal tunnel syndrome is commonly caused or aggravated by a traumatic wrist injury or fracture, diabetes, hypothyroidism and repetitive motion or cumulative trauma. For a particular activity to significantly aggravate carpal tunnel syndrome, the activity must require flexion of the finger muscles used to make a fist. The muscles must be used strenuously, rapidly and frequently. The most common work activity that significantly aggravates carpal tunnel syndrome is keyboard use.
10. Dr. Gilmer treated plaintiffs carpal tunnel syndrome conservatively, prescribing medications and a brace to be worn at night and during strenuous activity. Dr. Whitmer continued treating plaintiff through May 1997. His conservative treatment was unsuccessful.
11. Plaintiff presented to Dr. Nelson on 5 June 1997. He had symptoms indicative of median nerve compression. Dr. Nelson ordered a nerve conduction velocity study and an EMG test that confirmed that plaintiff had bilateral carpal tunnel syndrome, right greater than left. Due to the failure of conservative treatment, Dr. Nelson performed a right carpal tunnel release on Thursday, 3 July 1997. Dr. Nelson released plaintiff to return to light duty work on Monday, 7 July 1997. Plaintiff returned to light duty work for defendant on that date. Plaintiff continued to work in a light duty capacity for six weeks, at which time he returned to work in his usual position. Plaintiff continued to be so employed through the date of the hearing before the deputy commissioner.
12. Three physicians reviewed a videotape depicting the physical movements required by plaintiffs head press operator position. This videotape accurately depicted those activities. These physicians held differing opinions as to whether those activities were "repetitive and causally related to plaintiffs carpal tunnel syndrome.
13. The degree to which plaintiffs employment with defendant required him to strenuously, rapidly and frequently flex his finger muscles was sufficiently great as to cause carpal tunnel syndrome. Plaintiffs carpal tunnel syndrome was caused or significantly aggravated by his employment with defendant. Plaintiffs employment with defendant placed him at an increased risk of contracting or significantly aggravating carpal tunnel syndrome as compared to members of the general public not so employed.
14. Through the date of the hearing before the deputy commissioner, plaintiffs earning capacity was not diminished as a result of his bilateral carpal tunnel syndrome. However, plaintiff will benefit from additional treatment for this condition and he may, upon reaching maximum medical improvement, retain some permanent impairment as a result of his carpal tunnel syndrome.
15. Defendants defense of plaintiffs claim was not based in stubborn unfounded litigiousness. Rather, defendant offered competent expert testimony that plaintiffs carpal tunnel syndrome was due to an idiopathic condition, not his employment with defendant.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs carpal tunnel syndrome was caused or significantly aggravated by conditions that were characteristic of and peculiar to his employment with defendant and therefore, is an occupational disease. N.C. Gen. Stat. 97-53(13).
2. Plaintiff is entitled to payment of all medical expenses incurred as a result of his carpal tunnel syndrome for so long as such examinations, evaluations and treatments tend to effect a cure, provide relief or tend to lessen his disability. N.C. Gen. Stat. 97-59.
3. Defendants defense of plaintiffs claim was reasonable and therefore, plaintiff is not entitled to an award of attorneys fees. N.C. Gen. Stat. 97-88. 1.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay all medical expenses incurred as a result of plaintiffs carpal tunnel syndrome for so long as such examinations, evaluations and treatments tend to effect a cure, provide relief or tend to lessen his disability.
2. Defendant shall pay the costs.
This the ______ day of April 2000.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________ RENÉE C. RIGGSBEE COMMISSIONER
LKM/jth